## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Terrance Dwayne Winborn, | Case No. 22-cv-1811 KMM/ECW |
| Plaintiff, | |
| v. | **FIRST AMENDED COMPLAINT** |
| Kathy Blair Brakefield, acting in her individual capacity as a correctional officer at the Scott County Jail; Paige Pieschke, acting in her individual capacity as a correctional officer at the Scott County Jail; Debra Schneider, acting in her individual capacity as medical staff in the Scott County Jail; Scott Rettke, in his official capacity as the Assistant Jail Administrator at the Scott County Jail; Douglas Schnurr, in his official capacity as the Jail Administrator at the Scott County Jail; and Scott County, | **JURY TRIAL DEMANDED** |
| Defendants. | |

For his Complaint, Plaintiff Terrance Dwayne Winborn ("Winborn") hereby states and alleges as follows:

### Introduction

1.     This is an action for money damages against the Defendants due to their deliberate indifference to Winborn's serious medical needs while he was incarcerated at the Scott County Jail (the "Jail") from August 27, 2020, to August 28, 2020.

2.     The deliberate indifference of the Defendants proximately caused Winborn to suffer the effects of a *Streptococcus pyogenes* (bacteria) infection and a litany of other serious medical issues, including, but not limited to, a heart attack, purpuric lesions (skin hemorrhages) over much of his body *and* the life- and limb-threatening conditions of septic shock and gangrene.

1

3.      The deliberate indifference of t allowed the bacterial infection to fester within Winborn's body, causing immense pain and suffering and severe and permanent injury, including, but not limited to, bilateral transradial amputations of his arms and drastic changes to the appearance of his skin and body from the purpuric lesions.

4.      Winborn brings this action pursuant to 42 U.S.C. §§ 1983 and 1988, the Eighth and Fourteenth Amendments to the United States Constitution, and 28 U.S.C. §§ 1331 and 1343(a)(3).  The aforementioned statutory and constitutional provisions confer original jurisdiction of this Court over this action.

5.      As this action arises purely out of federal law, state-law claims, as well as the limitations and defenses under state law, are not applicable to this civil-rights lawsuit.

6.      Venue is proper in this Court under 28 U.S.C. § 1391, as the events giving rise to this action occurred in this District.

**The Parties**

7.      Winborn is, and was at all times material herein, a citizen of the United States and a resident of Marshall, Minnesota.  He was 59 years old at the time of the events giving rise to this action.  He suffered from chronic pancreatitis and rheumatoid arthritis, among other medical issues, and was prescribed medications for these conditions.

8.      Defendant Scott County is a "public corporation," suable under Minn. Stat. § 373.01, subd. 1(a)(1).  Scott County is, and at all times material herein was, a political entity charged with control and supervision of the Jail, located in Shakopee, Minnesota, and ensuring that constitutionally appropriate medical care was provided to all Jail inmates.

2

9.      Defendant Debra Schneider was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and acting under color of state law as a Jail medical staff employee.  Schneider is sued in her individual capacity as a Registered Nurse (RN) employed by Scott County to provide constitutionally required medical services at the Jail.

10.     Defendant Schneider's indifference was all the more galling given her job as a correctional nurse.  In that role, she served as a frontline, "boots on the ground" healthcare worker for inmates such as Winborn and the only conduit for him and other inmates to receive necessary medical care and treatment.  Jail inmates are completely dependent on Jail nurses such as Schneider to obtain treatment and care for their serious medical conditions.

11.     Despite this, Defendant Schneider ignored all of the warning signs of Winborn's deteriorating condition and nearly allowed him to die on her watch.  And she did so, at least in part, because of Scott County's custom of seeking less-expensive medical care for inmates, including eschewing emergent care even when an inmate's life-threatening condition called for it.Defendant Kathryn Blair Brakefield (Blair) was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and acting under color of state law as a correctional officer (CO) at the Scott County Jail.  Blair is sued in her individual capacity.

12.     Defendant Paige Pieschske was at was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and acting under color of state law as a correctional officer (CO) at the Scott County Jail.  At times Pieschske was the "Left-in-Charge" (LIC) officer, meaning that she was the acting supervisor – a role frequently held by

COs with the rank of Sergeant (like Pieschske).  LICs are COs that have been selected by their supervisors as those capable of handling the responsibilities and job duties.  Pieschske is sued in her individual capacity.

13.     Defendant Scott Rettke was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and acting under color of state law as the Lieutenant and Assistant Jail Administrator at the Scott County Jail.  Rettke is sued in his supervisory and official capacity.

14.     Defendant Douglas Schnurr was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and acting under color of state law as the Captain and Jail Administrator at the Scott County Jail.  Schnurr is sued in his supervisory and official capacity.

### The Jail's Serious Problem with Well-Being Checks

15.      Well-being checks are to be performed at varying frequencies depending on an inmate's mental-health and medical statuses.

16.     For inmates with normal mental-health and medical statuses, well-being checks should be completed every 30 minutes, but at staggered times.  *See* Minn. Administrative Rules, Chapter 2911.5000, subpart 5.

17.     The purpose of such well-being checks is to determine that an inmate is alive and well or, conversely, in need of medical or mental-health intervention or other intervention for his safety.

18.     Well-being checks are a vital duty performed by COs within Jails.

19.     As such the Minnesota Department of Corrections (DOC) Inspection and Enforcement Unit, reviews and evaluates the performance of well-being checks completed by COs at the Jail to see if they conform to the standards set out in the Administrative Rules governing Minnesota Jails – Chapter 2911.

20.     The Jail had been cited for noncompliance to the rules governing well-being checks in 2017 and 2018.

21.     In 2018, as a requirement due to the noncompliance issues regarding well-being checks at the Jail, the Jail instituted an internal auditing system where Sergeants would perform random reviews of checks.  The Sergeant reviews were done utilizing exported video depicting checks from the recent past.  The results of the review – good or bad – would be placed in the COs "working file" – a section of their personnel file.

22.     According to some Sergeants, this auditing was not formalized until after Winborn's incarceration at the Jail in August 2020.

23.     Despite the auditing system, the Jail remained noncompliant with the Rules on well-being checks through 2020 which was noted in both the DOC's inspection reports *and* review of "Special Incident Reports," which are the reports required for when an "unusual occurrence" occurs at a Jail such as an attempted suicide, riot or transfer to an outside medical facility.  *See* Chapter 2911.3700, subp. 4.

### Winborn's Arrest and Obvious Deterioration at the Jail

24.     Winborn was arrested by the Shakopee Police shortly after midnight on August 27, 2020, for various driving- and alcohol-related infractions.

25.     Around 1:30 a.m. on August 27, a breathalyzer was performed by the Shakopee Police and Winborn's blood alcohol content (BAC) measured 0.13.

26.     Winborn was taken to the Jail, where he was fingerprinted, screened for influenza and COVID-19 by correctional staff, and booked around 2:20 a.m. on August 27.

27.     Winborn had three medications on him when he arrived at the Jail – Warfarin, Acetaminophen, and a Budesonide inhaler.  All three were noted as "invalid" medications and were either held for Winborn to pick up upon his release from the Jail or destroyed.

28.     Given his blood-alcohol content (BAC) level upon arrival to the Jail, Winborn was housed in booking until his BAC measured at .000.

29.     COVID19 protocols were in effect at the Jail in August 2020, which required daily COVID19 screenings for new inmates for 14 days.

30.     Winborn's first COVID19 screening  was performed by RN Laura Perkins around 7:45 a.m. on August 27, while Winborn was in Booking – the unit where new inmates were housed at the Jail until they were cleared for assignment to a permanent Unit.

31.     The "medical assessment" reportedly occurred in the presence of a Correctional Officer (CO) Jacob Meyer.

32.     Winborn would encounter several other COs during his time at the Jail – some during the course of their daily Jail duties, including well-being checks.  Others would be alerted to him due to obvious medical needs.

33.     Within Perkin's  visit summary, Winborn denied any flu or cold-like symptoms, but Perkins noted that Winborn would continue to be monitored.

34.     Perkins chose not to document any rationale or details regarding the reason(s) Winborn required continued monitoring.  Perkins also failed to document the level of monitoring required.

35.     Perkins's lack of documentation was no aberration – little appropriate record-keeping was conducted at the Jail.

36.     From Jail records, the reader should be able to tell what was done, when, the rationale for the action, and who completed it.

37.     For example, each inmate's status and whereabouts are to be monitored and documented.  One way this is done is through well-being checks, discussed above.

38.     Per Scott County Jail policy, the times of the well-being checks, along with observations regarding an inmate's status and activity, should be logged by COs.

39.     But, COs were allowed to document well-being checks in a manner inconsistent with Jail policy.

40.     COs at the Jail in August 2020 were permitted to log their well-being checks *prior to* completing them.

41.     COs at the Jail in August 2020 were also permitted to log well-checking checks for entire pods – so, 20 or more inmates – at the *same* time and *prior to* completing the checks.  *See* ¶ 43. (example of entire pod logged at the same time).

42.     And, while the Jail's well-being check form within the LETG system provided space to record the following:

- Type of check;

- Location of check;

- PostLog;

- Officer;

- Start date/time;

- End date/time;

- Inmate name;

- Inmate date of birth; and

- Inmate notes,

the information recorded by COs in August 2020 failed to tell when the checks were

completed, how the checks were completed, how long the checks took and how the inmates

were doing – the vital information in determining if a check was performed in compliance

with the requirements of Rule 2911.

43. Specifically, within the LETG log of well-being checks completed during

Winborn's incarceration in August 2020, the end date and times frequently *matched* the start

date and time of the checks:

| Type | Location | PostLog Officer | StartDate | EndDate | Inmate | dob | InmateNotes |
|------|----------|-----------------|-----------|---------|--------|-----|-------------|
| HWC | NULL | 241/29: Chou Yang | 8/28/2020 9:27 | 8/28/2020 9:27 | W████ K | ███ | |
| HWC | NULL | 241/29: Chou Yang | 8/28/2020 9:27 | 8/28/2020 9:27 | K██ H██ | | |
| HWC | NULL | 241/29: Chou Yang | 8/28/2020 9:27 | 8/28/2020 9:27 | A████ H██ | | |
| HWC | NULL | 241/29: Chou Yang | 8/28/2020 9:27 | 8/28/2020 9:27 | A████ S██ | | |
| HWC | NULL | 241/29: Chou Yang | 8/28/2020 9:27 | 8/28/2020 9:27 | Terrance Winborn | 8/23/1961 | |
| HWC | NULL | 241/29: Chou Yang | 8/28/2020 9:27 | 8/28/2020 9:27 | D██ S██ | ███ | |
| HWC | NULL | 241/29: Chou Yang | 8/28/2020 9:27 | 8/28/2020 9:27 | E██ F██ R██ | | |
| HWC | NULL | 241/29: Chou Yang | 8/28/2020 9:27 | 8/28/2020 9:27 | R██ M██ | | |
| HWC | NULL | 241/29: Chou Yang | 8/28/2020 9:27 | 8/28/2020 9:27 | G██ T██ | | |
| HWC | NULL | 241/29: Chou Yang | 8/28/2020 9:27 | 8/28/2020 9:27 | D██ S██ | | |
| HWC | NULL | 241/29: Chou Yang | 8/28/2020 9:27 | 8/28/2020 9:27 | N██ M██ | | |
| HWC | NULL | 241/29: Chou Yang | 8/28/2020 9:27 | 8/28/2020 9:27 | E██ V██ | | |
| HWC | NULL | 241/29: Chou Yang | 8/28/2020 9:27 | 8/28/2020 9:27 | R██ M██ | | |
| HWC | NULL | 241/29: Chou Yang | 8/28/2020 9:27 | 8/28/2020 9:27 | S██ B██ | | |
| HWC | NULL | 241/29: Chou Yang | 8/28/2020 9:27 | 8/28/2020 9:27 | A██ L██ | | |
| HWC | NULL | 241/29: Chou Yang | 8/28/2020 9:27 | 8/28/2020 9:27 | W██ B██ | | |
| HWC | NULL | 241/29: Chou Yang | 8/28/2020 9:27 | 8/28/2020 9:27 | J██ M██ | | |
| HWC | NULL | 241/29: Chou Yang | 8/28/2020 9:27 | 8/28/2020 9:27 | R██ L██ | | |
| HWC | NULL | 241/29: Chou Yang | 8/28/2020 9:27 | 8/28/2020 9:27 | J██ M██ | | |
| HWC | NULL | 241/29: Chou Yang | 8/28/2020 9:27 | 8/28/2020 9:27 | M██ F██ | | |
| HWC | NULL | 241/29: Chou Yang | 8/28/2020 9:27 | 8/28/2020 9:27 | B██ Z██ | | |

44.     In several other instances, the end date and times of the checks are *before* the

start date and times of the checks:

| Type | Location | PostLog | Officer | StartDate | EndDate | Inmate | dob | InmateNotes |
|------|----------|---------|---------|-----------|---------|--------|-----|-------------|
| HWC | NULL | 293 | Chou Yang | 8/28/2020 13:48 | 8/28/2020 13:47 | W███ K | ███ | |
| HWC | NULL | 293 | Chou Yang | 8/28/2020 13:48 | 8/28/2020 13:47 | K██ H | ███ | |
| HWC | NULL | 293 | Chou Yang | 8/28/2020 13:48 | 8/28/2020 13:47 | A███ H | ███ | |
| HWC | NULL | 293 | Chou Yang | 8/28/2020 13:48 | 8/28/2020 13:47 | D███ S | ███ | |
| HWC | NULL | 293 | Chou Yang | 8/28/2020 13:48 | 8/28/2020 13:47 | B██ N | ███ | |
| HWC | NULL | 293 | Chou Yang | 8/28/2020 13:48 | 8/28/2020 13:47 | D███ S | ███ | |
| HWC | NULL | 293 | Chou Yang | 8/28/2020 13:48 | 8/28/2020 13:47 | E██ H R | ███ | |
| HWC | NULL | 293 | Chou Yang | 8/28/2020 13:48 | 8/28/2020 13:47 | D███ W | ███ | |
| HWC | NULL | 293 | Chou Yang | 8/28/2020 13:48 | 8/28/2020 13:47 | C██ S | ███ | |
| HWC | NULL | 293 | Chou Yang | 8/28/2020 13:48 | 8/28/2020 13:47 | D███ S | ███ | |
| HWC | NULL | 293 | Chou Yang | 8/28/2020 13:48 | 8/28/2020 13:47 | N██ M | ███ | |
| HWC | NULL | 293 | Chou Yang | 8/28/2020 13:48 | 8/28/2020 13:47 | R██ M | ███ | |
| HWC | NULL | 293 | Chou Yang | 8/28/2020 13:48 | 8/28/2020 13:47 | S██ B | ███ | |
| HWC | NULL | 293 | Chou Yang | 8/28/2020 13:48 | 8/28/2020 13:47 | A██ B | ███ | |
| HWC | NULL | 293 | Chou Yang | 8/28/2020 13:48 | 8/28/2020 13:47 | W███ M | ███ | |
| HWC | NULL | 293 | Chou Yang | 8/28/2020 13:48 | 8/28/2020 13:47 | R██ L | ███ | |
| HWC | NULL | 293 | Chou Yang | 8/28/2020 13:48 | 8/28/2020 13:47 | A███ | ███ | |
| HWC | NULL | 293 | Chou Yang | 8/28/2020 13:48 | 8/28/2020 13:47 | M██ F | ███ | |
| HWC | NULL | 293 | Chou Yang | 8/28/2020 13:48 | 8/28/2020 13:47 | B██ Z | ███ | |

45.     The COs that logged the checks were not necessarily the COs that completed

the checks and only sometimes was the actual well-being checker noted within the PostLog

column.

46.     Further, the "inmate notes" column was rarely – if *ever* – used to detail an

inmate's condition, status, activity, or well-being as observed by a CO during well-being

checks.

47.     Other Jail documentation was similarly deficient.

48.     The Scott County Sheriff's Office Jail Shift Report ("Shift Report") for the

shift from 2200 on August 26 to 0800 on August 27, for example, noted that Winborn had

"MD issues-meds-medical is aware of him."

49.     These shift reports are drafted by the Sergeants or LICs and are to include the

vital information regarding safety and security at the Jail – including medical updates on

inmates.

9

50.     Like Perkins on her Encounter Summary Report, this supervisor chose not to failed to document any rationale or details regarding Winborn's "MD issues" or the reason(s) medical was aware of him on the Shift Report.

51.     On August 27, 2020, Blair logged a number of well-being checks on Winborn:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PBT | NULL | Winborn .000 | | Kathryn Blair | 8/27/2020 11:44 | 8/27/2020 11:44 | Terrance Winborn | 8/23/1961 |
| HWC | NULL | | | Kathryn Blair | 8/27/2020 11:29 | 8/27/2020 11:29 | Terrance Winborn | 8/23/1961 |
| HWC | NULL | 261 | | James Hughes | 8/27/2020 11:06 | 8/27/2020 11:06 | Terrance Winborn | 8/23/1961 |
| HWC | NULL | 261 | | Kathryn Blair | 8/27/2020 10:41 | 8/27/2020 10:41 | Terrance Winborn | 8/23/1961 |
| HWC | NULL | 241 | | James Hughes | 8/27/2020 10:19 | 8/27/2020 10:19 | Terrance Winborn | 8/23/1961 |
| HWC | NULL | | | Jakob Meyer | 8/27/2020 10:03 | 8/27/2020 10:03 | Terrance Winborn | 8/23/1961 |
| Bail Hearings | NULL | @ 1030 or after regular court | | Kathryn Blair | 8/27/2020 9:51 | 8/27/2020 9:51 | Terrance Winborn | 8/23/1961 H6 |
| HWC | NULL | | | Kathryn Blair | 8/27/2020 9:42 | 8/27/2020 9:42 | Terrance Winborn | 8/23/1961 |
| HWC | NULL | | | Kathryn Blair | 8/27/2020 9:18 | 8/27/2020 9:18 | Terrance Winborn | 8/23/1961 |
| HWC | NULL | 272 | | Kathryn Blair | 8/27/2020 8:54 | 8/27/2020 8:54 | Terrance Winborn | 8/23/1961 |
| HWC | NULL | 272 | | Kathryn Blair | 8/27/2020 8:54 | 8/27/2020 8:54 | Terrance Winborn | 8/23/1961 |
| HWC | NULL | | | Kathryn Blair | 8/27/2020 8:34 | 8/27/2020 8:30 | Terrance Winborn | 8/23/1961 |
| HWC | NULL | | | Kathryn Blair | 8/27/2020 8:30 | 8/27/2020 8:30 | Terrance Winborn | 8/23/1961 |
| HWC | NULL | | | Kathryn Blair | 8/27/2020 8:30 | 8/27/2020 8:30 | Terrance Winborn | 8/23/1961 |
| Headcount | NULL | Total 4/all in | | Kathryn Blair | 8/27/2020 8:07 | 8/27/2020 8:07 | Terrance Winborn | 8/23/1961 |
| Meal Pass | NULL | 4 meals offered/4 accepted | | Kathryn Blair | 8/27/2020 7:41 | 8/27/2020 7:41 | Terrance Winborn | 8/23/1961 |
| HWC | NULL | | | Kathryn Blair | 8/27/2020 7:40 | 8/27/2020 7:40 | Terrance Winborn | 8/23/1961 |

52.     Blair completed all checks logged by her that do not include a different CO's badge number in the "PostLog" notes section – totaling 12.

53.     Further, Blair's badge number – 241 – is noted as having completed additional checks on Winborn.

54.     Blair utilized the Jail's correctional documentation system (LETG) to document her observations of Winborn, shown above.

55.     At some point during Blair's observations of Winborn, she observed medical issues with Winborn, specifically that he was vomiting.

56.    Blair did not document these medical issues in the well-being log, but she did record them in supplemental reports:

**Supplemental View**

Topic                    Vomited

1000  He vomited a couple of times in the toilet while in H6.  KB241

1100  Returned from his bail hearing and vomited again several time into the toilet.  KB241

57.     Winborn's vomiting was not explained by his BAC – which was not particularly high when he was arrested and had resolved many hours before his vomiting began.

58.     Instead, the vomiting was an objective warning regarding Winborn's medical condition (indeed, a flu- or COVID19-like sign at a minimum).  He required timely assessment by medical personnel, including vital signs and evaluation of his hydration status.

59.     None occurred.

60.     Instead, Blair chose to only documented these minimal details of Winborn's vomiting (not his condition, follow-up, his description of how he was doing) on the LETG system – a place nursing staff did *not* reference or review for inmate information *unless* directed to.

61.     Blair chose not to direct medical to her supplemental reports or otherwise bring Winborn to the attention of any medical staff despite her observations of a medical condition requiring further assessment trained providers.

62.     No evidence of his vomiting was included on the Sergeant Shift Reports.

63.     As such, no Jail medical, nor outside medical care – read: expensive care – was sought.

64.     The only other action taken by Blair was to administer a PBT.  Winborn blew a .000.

65.     Jail video would have depicted Winborn in his cell in Booking, except for the toilet area.

66.     As such, video would have shown Winborn's condition and activities before, after, and perhaps during – at least in part – the bouts of vomiting noted by Blair.

67.     The video would have shown Winborn's condition and activities during Blair's well-being checks on him.

68.     The video would have shown Blair's actions and inactions regarding Winborn – who she, like the other deponents thus far, does not remember.

69.     The video would have depicted Winborn within Jail hallways and the tunnel leading to his Court appearance and his condition between his bouts of vomiting.

70.     The video would have depicted the amount of time Blair and other COs spent with Winborn in Booking and what was observable about him during the morning of August 27, 2020.

71.     But, the Jail's video evidence from Winborn's incarceration in August 2020 was allowed to be deleted by the Defendants and those in power to act by Defendants – namely, the Sergeants.

72.     Instead , Blair handed the sick, vomiting, decompensating Winborn over to the COs in C-Pod, which became his new housing unit after his BAC measured .000.

73.     Next, Pieschske reportedly completed well-being checks on Winborn on August 27, 2020 while he was in C-Pod.

74.     Pieschske chose not to enter *any* information regarding Winborn's condition, status, activity, or well-being within LETG.

75.     However, on August 27, Winborn "complain[ed] about his arthritis and not having his meds."

76.     Winborn's complaints were communicated to Pieschke.

77.     Pieschke emailed Winborn's complaints to an email distribution list that included all Jail medical, including Perkins and Schneider; then-Jail Administrator, Captain Douglas Scnhurr; and Assistant Jail Administrator, Lt. Rettke., as well as Sergeant Barbara Winterfelt.

78.     Perkins, responding for medical, emailed that Winborn could have "OTC Tylenol" for his arthritic pain and, further, that *she* had ordered an inhaler.

79.     Over the ensuing hours, over a dozen well-being checks on Winborn in C-Pod were logged.  Such checks, if performed and logged properly, would have revealed that Winborn's condition was rapidly worsening.

80.     These well-being checks for Winborn were also recorded in the manner described above – failing to detail his condition, status, activity, or well-being.

81.     Despite the COs' consistent memory lapses with regard to Winborn and the destruction of the video, the evidence shows that Winborn's health was declining before their eyes.

82.     Schneider met with Winborn in C-Pod the morning of August 28, 2020 for his second COVID19 screening visit.

83.     The exact time of the encounter was not recorded by Schneider on any jail correctional or jail medical form.

84.     It was practice for Jail medical staff *not* to chart medical notes while visiting the inmates.  Instead, the nurses would make their rounds, take notes and then enter the

inmates' medical information on their electronic Jail medical recording system when convenient to them and did not note the real time of the encounter.

85.     Per Schneider, her morning visit with Winborn on August 28, 2020 likely occurred between 8 am and 9 am an hour or more before she charted his information.

86.     The only way to know the exact time of Schneider's visit would have been from the video captured by cameras in the C-Pod, which again was allowed to be deleted by Defendants and those in power to act by defendants – namely, the Sergeants.

87.     By this morning's visit, Winborn's clinical appearance had dramatically deteriorated.

88.     Schneider noted that Winborn "**was unable to stand up for [the] encounter**." (emphasis added).

89.     Winborn had to be asked questions several times before he could answer.

90.     "[Winborn] was mumbling and holding his right hand, **which [was] extremely swollen**." (emphasis added).

91.     Winborn stated he was **in pain**.

92.     The only vital sign recorded by Schneider was Winborn's temperature.

93.     The danger signs at this meeting according to Schneider's own chart note were staggering. According to her written records, Winborn exhibited obvious, concerning, and serious medical needs, including swelling, pain, and altered mental status – all of which were *in addition* to his prior bouts of vomiting.

94.     Schneider, unconvincingly *and* without evidence to disprove her written record from the day of her visit (because she, like the other deponents does not remember Winborn

*and* the video evidence has been deleted) attempted to walk back portions of her encounter summary:

> **So instead of "unable to stand," I would say**
> **"didn't come to the door."**
>
> **…**
>
> But yet we have in your record that at
> point -- at some point during your interactions with
> Mr. Winborn, he was both unstable and unable to stand.
> Correct?
> **A. That's what it says, yes.**
> Q. Okay. But you do not stand by those
> statements?
> **A. Correct.**

95.     Regardless of what she said nearly three years after the encounter, Winborn was obviously clinically declining.

96.     And, even according to Schneider's description and her testimony (below), Winborn had a serious medical problem:

> **A. If he was unable to stand, there would be**
> **more charting, more follow-up.**
> Q. That's because that is a serious problem.
> Correct? If you have an inmate who is unable to stand
> up for a COVID round, that means you've got a serious
> medical problem. True?
> **A. True.**

97.     Winborn needed immediate medical care.  To obtain such care, however, would have been costly to the County.

98.     Instead, Schneider noted that no injury had occurred to Winborn's hand. Despite that he could not stand, was mumbling, and had difficulty answering questions, all of which indicate an abnormal metal status, Schneider felt that "getting his fingerprints

15

taken" was the reason for his swelling – a nonsensical justification for an incoherent and sick man.

99.     Schneider noted that an X-ray would be ordered.

100.    From the provided records and available testimony, it is unclear *who* ordered the X-ray.

101.    Schneider noted that Dr. Michael Wilcox, the Jail's Medical Director, was to be contacted for "further orders."

102.    From the records and available testimony, it appears that Wilcox was, at best, contacted via phone or email about the X-ray.

103.    But, Wilcox *never* saw, treated, assessed, or evaluated Winborn.

104.    Yet, Wilcox is listed as Winborn's "clinician" and "physician" on some of the medical records obtained from the Jail – this was truly in name only.

105.    Approximately 40 minutes after Schneider entered the above-described chart note for Winborn, he became the topic of instant messages between at least two COs.

106.    CO Gerado Cerda altered CO Benjamin Lentz that he was going to check on Winborn and may have to call a Code Blue – medical emergency for him.

107.    CO Benjamin Lentz then messaged with CO Chou Yang regarding this and other known issues with Winborn:

**Yang, Chou 10:51 AM:**
  Might be code blue, medical. Cerda gonna check on him now
**Yang, Chou 10:51 AM:**
  heads up
**Lentz, Benjamin 10:51 AM:**
  copy
**Lentz, Benjamin 10:52 AM:**
  Whom?
**Yang, Chou 10:52 AM:**
  Winborn
**Lentz, Benjamin 10:53 AM:**
  sounds like he vomited alot yesterday
**Lentz, Benjamin 10:53 AM:**
  did he eat breakfast
**Yang, Chou 10:53 AM:**
  think so
**Lentz, Benjamin 10:53 AM:**
  if not hes probably dehydtrated
**Lentz, Benjamin 10:54 AM:**
  the dud is 59 years old
**Lentz, Benjamin 10:54 AM:**
  and an alcholic...
**Lentz, Benjamin 10:54 AM:**
  geez..
**Yang, Chou 10:54 AM:**
  prob

108.   Cerda did as he told Lentz he would and checked on Winborn.

109.   Cerda found that Winborn was having trouble breathing – and measured his breaths by *touching him* and counting the number of chest rises to calculate his breaths per minute.

110.   Cerda also attempted to obtain other vitals for Winborn, but was unable to do so.

111.   Cerda chose not to draft a report about his interaction with Winborn.

112.   The video cameras would have captured some of Winborn's actions in C-Pod (individual cells in C-Pod were not surveilled) and portions of Cerda's check on Winborn or

17

*at least* shown how much time Cerda spent with Winborn.  Again, this was allowed to be deleted by Defendants and those in power to act by defendants – namely, the Sergeants

113.    After checking on Winborn, Cerda called Schneider to report that Winborn **was having trouble breathing**.

114.    Specifically, Cerda informed Schneider about Winborn's **abnormal, elevated breaths per minute plus the inability to obtain other vitals**.

115.    Clearly, Winborn had been permitted to further clinically decompensate without any medical intervention or treatment.

116.    As Schneider noted, Winborn was "**unstable**" earlier that day.

117.    Winborn was seen by Schneider as a result of Cerda's observations.

118.    Again, Schneider's charting was not done contemporaneously with the visit. She entered Winborn's information sometime later at 12:15 p.m.  The details of when the visit occurred would have been captured on the surveillance video.

119.    Regarding this second visit,

120.    Schneider noted Winborn's "chief complaint" was "trouble breathing."

121.    Despite that "chief complaint," Schneider failed to obtain Winborn's heart rate or oxygen level.

122.    This was reportedly because the pulse oximeter – a small device typically placed on a patient's finger to assess the oxygen saturation in a patient's blood – was unable to obtain a reading.

123.    Schneider made no further efforts to assess Winborn's "chief complaint." She could have taken Winborn's pulse or listened to obtain his heart rate. She also could have used an earlobe to obtain Winborn's oxygen level. She chose to do none of these things.

124.    Schneider's inability to obtain Winborn's reading using the pulse oximeter – absent an obvious mechanical issue – was another red flag to a nurse. This should have signaled to her or any correctional nurse that Winborn was not perfusing his extremities and was going into shock.

125.    And yet, Schneider chose not to to refer Winborn for any medical care – let alone expensive, *emergent* medical care. She did not consult a doctor, call an ambulance, or contact an emergency room or emergency medical service, including Winborn's supposed "clinician" Dr. Wilcox, despite these very serious red flags which, when combined with his poor appearance at the "assessment" less than an hour prior, rendered it obvious that Winborn needed to be evaluated and treated immediately.

126.    But Schneider chose not to have Winborn transported emergently to any outside medical facility.

127.    Instead, Winborn was simply moved from C-Pod back to Booking for observation.

128.    The records provided by Scott County to date are unclear as to *who* made the decision to move Winborn to Booking and exactly when the move took place.

129.    The Sergeant Shift Report for the 0700-1500 shift on August 28 indicates that the decision was made by Jail *correctional* staff:

130.   Yet, according to the Encounter Summary Report signed by

131.   Schneider at 12:18:13 p.m., it was done at *her* direction.

132.   Either way, no documentation as to the level or frequency of the required observations was recorded.

133.   Winborn's Medication Administration Record (MAR) notes that at 11:40 a.m. on August 28, he was provided two puffs of an Albuterol inhaler.  The inmate signature space was signed by Schneider as shown below, yet there is no mention of this in her Encounter Summary Report.



134.   Like other Jail records, the scant medical records provided by the Jail lack detail or appropriate, fulsome documentation as to what was done, why, by whom or at whose direction.

135.   Further highlighting this issue *as well as* Winborn's deteriorating medical status is an email that

136.    Schneider continually drafted throughout her shift on August 28, 2020 – the final of which would serve to update the next nurse on duty at the Jail.

137.    The pertinent part regarding her observations of Winborn up to this point in time – around noon on August 28, 2020, stated as follows:

> Winborn, Terrance – he had a rough day today. When I first met with him this morning I was concerned about his level of consciousness but he was eventually able to tell me his name, where he is, and what month it is. He states he is just in a tremendous amount of pain due to his rheumatoid arthritis. His right hand is significantly swollen, and IM states this is not his baseline and no injury occurred. I ordered an x-ray for his hand to rule out any fracture. They did come and do the x-ray but no results yet. Around 11am officers called me to tell me that he was struggling to breathe and they counted 40 breaths per minute. They were unable to get any other vitals on him. I had him brought down to booking since **I was already concerned about him**. His BP was good but I was unable to get his o2 and HR because the pulse ox couldn't read it. **His hands were freezing** so I had them give him a hot pack to try to warm his hands up and just let him rest for a while. I also gave him his inhaler at that time. I ordered 1000mg of acetaminophen TID for him to try to help manage his pain. He states he takes oxycontin and Percocet on the outside.

(emphasis added).  Much of this information about Winborn's medical condition was glaringly absent from his *medical records* charted by Schneider.

138.    The above section of

139.    Schneider's email gives credence to her medical notes, *as charted*, and eliminates any notion of credibility in her attempt to recant the alarming facts she included therein.

140.    Schneider sent the information to another Jail nurse just minutes after Winborn was admitted to the first hospital.

141.    Despite his deteriorating condition, Schneider decided to keep the vomiting, swollen-and freezing-handed, struggling-to-breathe Winborn at the Jail, in Booking, for "monitoring" or "observation."

21

142.    "Monitoring" and "observation" could do nothing to help Winborn.  Instead he sat in booking where no one could provide the help he so desperately needed, but which the Defendants declined to obtain.

143.    Over the ensuing hours, additional well-being checks on Winborn were completed and logged.  Such checks, if performed and logged properly would have revealed that Winborn's condition was rapidly worsening.  .

144.    Some of these checks were performed by Pieschke – including checks around the time the breathing and other issues were known and appreciated at the Jail.

145.    Pieschke's actions and inactions would have been captured on video from Booking.

146.    Later on August 28, 2020, Schneider was *again* alerted of an obvious and serious medical issue with Winborn – this time by Pieschke.

147.    Winborn had fallen off his bunk in his cell in Booking.

148.    This fall from his bunk in Booking would have been captured by the surveillance cameras in Booking, but such critical evidence was allowed to be deleted.

149.    Schneider met with Winborn and Pieschke in Booking.

150.    Schneider noted in her Encounter Summary Report that Winborn "**has been rapidly declining**" – a fact known and appreciated by her earlier that day and made even more apparent by Winborn's then-graver appearance, signs, and symptoms.

151.    Schneider denoted Winborn's chief complaints as shortness of breath and dizziness.

152.    Schneider further noted Winborn's blood pressure measured "extremely high" at 266/180.  Such exceedingly elevated blood pressure indicated hypertensive crisis and that Winborn was in dire need of emergency medical attention.

153.    Winborn was unable to describe other symptoms beyond suffering from "lots of pain."

154.    Schneider chose not to provide a description as to *why* Winborn was unable to describe his symptoms, but shortly thereafter he was described as not talking and being nonresponsive.

155.    Schneider chose not to repeat a blood-pressure reading after measuring his blood pressure as 266/180 or treat this life-threatening emergency.

156.    Winborn reportedly was gasping for air throughout his encounter with Schneider and Pieschke.

157.    Schneider chose not to obtain Winborn's oxygen level.

158.    Pieschke chose not to document her observations and interactions with Winborn for this encounter.  She, like the others, does not remember Winborn.

159.    As such, only the video could depict the truth of the events surrounding this time because, due to his medical status, Winborn does not have an independent recollection of much of August 28, 2020.

160.    Only now, due to "his high [blood pressure] **and his past medical history**, it was determined that [Winborn] should be seen at [a Hospital]" – although not emergently, with its attendant costs.

161.    Thus, no ambulance was called.  As such, Winborn did not receive treatment from emergency personnel until he was finally delivered to the hospital.

162.    A CO transported Winborn to St. Francis Regional Medical Center (St. Francis), which is approximately 3.2 miles away from the Jail.

163.    Despite its close proximity, Winborn arrived at the Emergency Department at St. Francis at 5:25 p.m. – *at least* 46 minutes after his visit with Schneider.

164.    The Jail Shift Report for the 1400 to 2200 shift on August 28 noted Winborn's transport and admission, while nearly in the same breath, working to figure out how to get out of paying for Winborn's medical costs by contemplating his early release from custody:

❑ Winborn (CP) sent to ER per medical - admitted to Hospital and will need hospital security. Called on-call county attorney and if inmate will be admitted for long period of time we can call back and look at options. Judge would need to amend release order.

165.    Jail personnel were already working to figure out how to get out of paying for Winborn's medical costs by contemplating his early release from custody.

166.    This knowledge, along with further updates on Winborn's life-threatening medical issues, was reported to Jail Administration and other Sergeants throughout August 28 and 29.

167.    The potential for litigation was obvious.

168.    Despite this, no report was made to the DOC regarding Winborn's transfer to the hospital within 10 days of the transfer itself as required by Minn. Admin. Rule 2911.3700(E);

169.     As a consequence, or by design, of the Jail's decision not to report to the DOC, the DOC was none the wiser about Winborn's serious medical incident at the Jail in August 2020.

170.     As a consequence, or by design, of the Jail's decision not to report to the DOC, the DOC would not ask to review the video evidence from Winborn's time at the Jail in August 2020.

171.     Despite the obvious potential for litigation, none video evidence of Winborn's time at the Jail in August 2020 was preserved.

### Impact of Deleted Video Evidence

172.     The video from Winborn's time at the Jail captured many times and items of import – including his arrival, intake, booking and fingerprinting; his bouts of vomiting and his ensuing travel to and from court via the tunnel; his transfers between housing units via hallways; his time in his Booking cell; his time in the C-Pod; well-being checks by COs or noncompliance with the policy and Administrative Rules; his fall off his bunk; his interactions with Jail medical and correctional staff; his deteriorating medical status; and his eventual transport to St. Francis Emergency Department through the Jail sallyport.

173.     Clearly, video would have contained objective evidence of Winborn's condition at the Jail.

174.     Clearly, video would have contained objective evidence of Defendants' deliberate indifference.

175.     In fact, many deponents agree that the video would be helpful to fill in where the documentation is lacking, confusing, or missing.

176.    Many deponents agree that the video would be helpful to corroborate or dispel actions or inactions regarding Winborn.

177.    Many deponents agree that the video would be helpful to refresh absent recollections.  This was true of every deponent who failed to remember Winborn at all.

178.    Further, many deponents agree that the video evidence is *the* way to tell who completed well-being checks on Winborn, how they were done, when they were done and what was observable during the checks – particularly those that were logged for him when he was housed in Booking.

179.    Despite Defendants' understanding the evidentiary value of video evidence, Jail personnel's actions and inactions ensured the video evidence of Winborn's time at the Jail in August 2020 would be gone within 90 days.

180.    This destruction occurred despite the Defendants' knowledge of the severity of the injuries Winborn suffered and his potential legal action by Schnurr by *at least* August 31, 2020.

181.    Others, including Rettke, three Sergeants – the ones trained on preserving video evidence – knew of the severity of Winborn's injuries and the potential for litigation on August 28 or 29.

182.    Several negative inferences can – and should be – drawn from the spoliation of the video evidence, and the other missing evidence regarding Winborn's time at the Jail in August 2020.

183.    This is particularly true from the records that have been produced, which confirm that Winborn was ***anything but well***.  He was in obvious need of treatment of

numerous serious and worsening medical conditions, well beyond what could be provided by a correctional nurse and beyond the de minimus "medical attention" he purportedly received from Schneider.

**Winborn's Hospital Course**

184.    Winborn arrived at St. Francis Hospital with his escort from Scott County.

185.    According to the report from Scott County personnel, Winborn had not been talking prior to his arrival there and he was transferred to the hospital was because "he was not acting right" or "didn't look right."

186.    Schneider had consciously allowed Winborn's dire condition to worsen, without any intervention or attempts to obtain treatment, to such a point that St. Francis nursing personnel noted he was "not responding to verbal or painful stimuli."

187.    Winborn's mental status was altered.

188.    Winborn's left pupil was larger than his right pupil and it was sluggish to respond.

189.    Winborn had emesis – vomit – around his lips.

190.    Winborn's left upper extremity was stiff.

191.    Winborn's right arm was swollen.

192.    Winborn exhibited pursed-lip breathing and was nonverbal.

193.    Winborn's Glasgow Coma Scale score was 5 – meaning his consciousness was severely impaired.

194.    Winborn continued to suffer shortness of breath and his blood pressure remained extremely elevated.

195.    Initially "code stroke" was called and Winborn was placed in "room 22" to assess if he needed to be intubated.

196.    Winborn's glucose was tested and noted to be less than 20 – a life-threatening level of hypoglycemia.  As such, an IV was immediately placed so he could receive D50 – an emergency rescue medication – which helped Winborn regain the ability to speak, although his speech was still slurred and difficult to understand.

197.    Winborn managed to communicate that he was suffering from severe back pain.

198.    Because of Winborn's continued speech issues, a CT and CTA of the head and neck were obtained.

199.    Personnel at St. Francis ED immediately had "concerns for severe disease" and Winborn's initial labs showed metabolic acidosis and his chemistry was concerning for a new acute kidney injury (AKI).

200.    Winborn also had a left-sided kidney stone with stranding as well as acute pancreatitis.

201.    Winborn's physical exam and initial lab results from St. Francis noted an obviously and severely ill individual in acute distress.

202.    Winborn required a higher level of care than that available at St. Francis and he was transferred to Abbott Northwestern via ambulance.

203.    The ambulance records note that Winborn described his right-hand swelling had existed "before" and he rated his headache and back pain at a 10/10.

204. The ambulance crew's impression, like those from the Emergency Department at St. Francis, was sepsis.

205. Winborn arrived via ambulance to Abbott at 10:17 p.m. and he was admitted to the Intensive Care Unit (ICU).

206. Winborn was hypotensive, tachycardic, poorly responsive and complained of back pain.

207. Winborn's right hand remained swollen.

208. Further, it was uncovered that Winborn had had hematuria – blood in the urine – since before his arrest.

209. Scott County personnel's observations that Winborn "did not look right" was quite an understatement according to critical care doctor Jessica Boland.

210. Abbott ICU's plan and assessment for Winborn involved addressing the following issues:

- Septic Shock due to Streptococcus pyogenes;

- Left ureteral stone;

- Acute kidney injury with profound metabolic acidosis, hypocalcemia, hypokalemia and hypomagnesemia;

- Acute inferolateral STEMI (heart attack), suspected due to hyperviscosity in setting of dehydration, sepsis;

- Anemia; and

- Hypoglycemia.

211. Winborn required pressors to keep his mean arterial pressure above 65.

212.    While the pressors were required as part of Winborn's treatment, they likely contributed to Winborn's later need to amputate.

213.    With Winborn's "multiorgan failure[,] there was a significant likelihood of sudden, clinically significant, or life-threatening deterioration," which required direct personal management by Dr. Clara Zamorano – a Board Certified Intensivist.

214.    By August 29 Winborn had been formally released from Scott County's custody to avoid costs and security needs, but his hospitalization and need for medical care were far from over.

215.    As of August 29, 2020, the following were noted with regard to Winborn's life-threatening diagnoses:

**IMPRESSION/PLAN:**

**Life threatening diagnosis**
**#1 Inf - Lateral STE MI**
**#2 Mixed shock**
**#3 AKI**
**#4 Multiorgan failure**

216.    Winborn's right-hand pain, swelling, and drainage continued into August 29, 2020. An ultrasound was performed which resulted in a consultation with orthopedic surgery that noted a likely hand infection.  The plan was bedside irrigation and debridement.

217.    Winborn was intubated on August 29 and underwent the irrigation and debridement procedure the same day.

218.    Winborn's blood cultures grew *Streptococcus pyogenes*.

219.    Winborn was suffering from Group A *Streptococcus* necrotizing fasciitis of the right hand.

30

220.    Winborn also "[d]eveloped purpura fulminans [secondary to] strep pyogenes with purpuric lesions of the lower extremities and thrombocytopenia."

221.    Winborn remained intubated and sedated on August 30 and, despite the prior bedside debridement of his swollen and infected right hand, Winborn's condition worsened.

222.    There was the necrotizing infection in Winborn's right hand with no other obvious source of the infection.  To control the source and help him survive, amputation up to the right distal forearm was recommended.

223.    The amputation of Winborn's 28 centimeters right hand and forearm was completed on August 30, 2020.

224.    Winborn suffered a host of other medical issues at Abbott including, but not limited to: tongue ischemia, lesions on his lips, necrosis to the scrotum, necrosis to the left upper extremity, acute renal failure requiring CRRT and intermitted HD, cytopenias, purpuric rash that enveloped his scrotum and phallus, left upper extremity with dry gangrene, GI bleeding and ischemia of digits of the left hand.

225.    During his hospitalization at Abbott, Winborn required antibiotics, blood cultures, imaging, fluid resuscitation, a urinary catheter, aggressive bicarbonate supplementation, replacing of potassium, magnesium, calcium, medical management for the acute MI (heart attack), monitoring of his hemoglobin levels, further medication monitoring and other supportive care.

226.    In addition to the orthopedic surgery consultations, Winborn required consultations with infectious disease, nephrology, cardiology, acute care surgery, vascular surgery, ear nose and throat and many other providers due to his widespread medical issues.

227.    By September 5, 2020, Winborn's septic shock had slowly resolved per hematology/oncology.  Yet, Winborn had multiple open areas of desquamation, primarily on the scrotum.

228.    Winborn was losing portions of his body due to the sepsis and the treatment he required to keep him alive as depicted below:






229.    By September 11, 2020, Winborn remained sedated, intubated, unresponsive and he was "unlikely to survive the discharge to the community."

230.    Winborn underwent a revisionary amputation of right forearm on September 28, 2020, after the local skin failed to resolve dehiscing.  During this procedure, approximately 3 more inches of his right forearm were removed:



231.    Winborn was discharged from Abbott on October 1, 2020 to Regency Hospital of Minneapolis for further management.

232.    On October 26, 2020, Winborn was finally decannulated.  He had spent two months on a ventilator.

233.    One of the other main focuses during his time at Regency was pain control.

234.    But Winborn's hospital course at Regency was complicated by right lower lobe pneumonia and MSSA found in his sputum.

235.    Further, it was determined that Winborn was not a candidate for skin grafting

– his skin would remain a drastically different color than when he went into the Scott

County Jail:



236.    Upon his discharge from the acute care unit of Regency Hospital on

November 24, 2020, the following were listed as Winborn's primary and secondary

diagnoses:

**Primary Discharge Diagnosis:**
1- Necrotizing fasciitis/sepsis and septic shock due to Streptococcus pyogenes/s/p upper limb amputation, right/dr gangrene of left hand/ischemia of digits of left hand
2- Rheumatoid arthritis/chronic pain
3- DVT/upper extremity, Hx of PE
4- Small SDH hematoma, resolving on repeat ct done at ANW hospital
5- AKI, s/p CRRT and intermittent HD.  AKI resolved and perma cath removed
6- STEMI, s/p ballon angioplasty of the left posterior descending artery/mo stent
7- Chronic pancreatitis/stable pseudocyst/TObacco and alcohol use, hx of
8- Lower GI bleed attributed to rectal tube mucosal bleeding/Anemia/Thrombocytopenia
9- Acute hypoxic respiratory failure, s/p tracheostomy.
10- Colonic ileus, resolved
11- Scrotal desquamation, s/p suprapubic catheter placement
12- Nephrolithiasis
13-Purpura fulminans involving the tongue and lips
14- Encephalopathy, toxic and metabolic, resolved
15- Physical deconditioning
16- Dysphagia, on TF/PEG and modified oral diet per SLP
17- Pneumonia, right lower lobe, MSSA
18- Anasarca 2/2 hypoalbuminemia
19- Hypokalemia, resolved
20- Hypocalcemia, corrected, 9.5

**Secondary Discharge Diagnosis:**
**Patient Active Problem List**
Diagnosis
• Physical deconditioning

237.    From Regency, Winborn was admitted to North Ridge Health and Rehab – a skilled nursing facility – where he would receive continued care and rehabilitation because he was still on a feeding tube and he could not dress himself, groom himself, bathe or shower, turn or change positions, or walk, among many other tasks of daily living.

238.    The following is Winborn's list of active diagnoses while at North Ridge:

- Coronary Artery Disease;

- Deep Venous Thrombosis;

- Renal Insufficiency, Renal Failure or End-Stage Renal disease;

- Severe Sepsis with Septic Shock;

- Hyperlipidemia;

- Arthritis;

- Necrotizing Fasciitis;

- Gastrointestinal hemorrhage;

- Chronic Respiratory Failure, Unspecified with Hypoxia or Hypercapnia;

- Nontraumatic subdural hemorrhage, unspecified;

- Encephalopathy, unspecified;

- Metabolic encephalopathy;

- Other chronic pancreatitis;

- Ileus, unspecified;

- Pruritus scroti;

- Calculus of kidney;

- Chronic pain syndrome;

- Rheumatoid arthritis, unspecified;

- Chronic kidney disease, unspecified;

- ST Elevation (STEMI) myocardial infarction of unspecified site; and

- Other chronic pancreatitis.

239.     Winborn's weight significantly dropped over the course of his medical decline and treatment therefor.  Upon his arrival at North Ridge, Winborn was thin, weighing just 126 pounds, down significantly from his normal 180 pounds.

240.     Winborn's body was covered with wounds.  His left hand was necrotic and he had an infection in his foot.

241.    Winborn had wasting in his orbital and buccal fat pads, temporalis, and clavicle.

242.    Winborn was unable to move his mouth well when speaking.

243.    Winborn continued to have significant pain in multiple areas.

244.    In December 2020, Winborn's chief complaint while at the nursing home was his multisite pain despite taking oxycodone.  He received a prescription for Morphine Sulfate.

245.    At this time, Winborn required daily wound care, sometimes multiple times per day, which was a painful process in and of itself.

246.    Winborn continued to lose his hair and his skin.

247.    Winborn became increasingly weak.  His endurance had significantly diminished.  He required physical and occupational therapy to address these deficits, as well as his pain.

248.    Throughout his stay at North Ridge, Winborn also required speech therapy, skilled nursing services, and clinical monitoring.

249.    Winborn continued to require staff's assistance with basic tasks of daily living, such as turning in bed, standing up, bathing, toileting, and eating.

250.    Winborn also utilized assistive devices such as a wheelchair and a walker.

251.    Winborn continued to require a catheter.

252.    Additionally, Winborn had follow-up visits for his multitude of problems at Twin Cities Physicians and with orthopedics.

253.    At a December 7, 2020 follow-up appointment with orthopedics, Winborn was sent back to Abbott for re-admission due to an infection – this time in his left hand.

254.    On December 8, 2020, Winborn underwent a left forearm amputation.

255.    On December 28, 2020, Winborn was discharged from North Ridge.

256.    As a result of Defendants' deliberate indifference to multiple red flags that depicted an obviously ill and clinically declining individual, Winborn remains severely and permanently injured.

257.    Winborn has medical special damages from St. Francis Hospital, Abbott Northwestern Hospital, Regency Hospital and a multitude of medical providers and, because of Winborn's condition, he is unable to presently ascertain the full extent of his medical special damages, but they currently exceed $2,000,000.

258.    Winborn suffers daily from emotional distress and physical pain.

259.    Winborn will require specialized medical and personal care for the rest of his life, in an amount estimated to be several millions of dollars.

260.    Adding insult to injury, Winborn was recently charged by the Scott County Attorneys' Office relating to the August 27, 2020 arrest.

## COUNT ONE

### 42 U.S.C. § 1983

### EIGHTH AND FOURTEENTH AMENDMENT VIOLATIONS
### *Plaintiff v. Defendant Kathryn Blair Brakefield*

261.    Winborn realleged and incorporates by reference herein each and every allegation contained above as if set forth herein.

262.    Defendant Blair observed Winborn's progressing medical issues.

38

263.    Defendant Blair had a constitutional duty to provide for the safety and general well-being of Winborn.

264.    Defendant Blair, under color of state law, acted with deliberate indifference to Winborn's serious medical needs during his confinement at the Jail by consciously ignoring the red flags that illustrated Winborn was an ill individual, clinically declining and in need of medical attention and treatment.  These actions or inactions were done in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

265.    Defendant Blair, under color of state law, knew of and consciously disregarded obvious and serious risks to Winborn's health and safety and acted with deliberate indifference in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

266.    Defendant Blair subjected Winborn to these deprivations of his rights either maliciously or by acting with reckless disregard for whether his rights would be violated by her actions.

267.    Winborn suffered from *Streptococcus pyogenes* and a litany of other serious medical issues, including, but not limited to, a heart attack, septic shock, gangrene and purpuric lesions and the fallout therefrom, which includes (but is not limited to) the amputation of both hands and the loss of much of his skin, as a direct and proximate result of the acts and omissions of Defendant Blair, and he was thereby damaged in an amount yet to be determined.

268.    Winborn suffered greatly while infection was permitted to fester in his swollen, painful right hand and thereafter, up to and including the present. Winborn

exhibited obvious signs of illness and quickly deteriorated during his stay at the Jail and has

suffered as a result of the conscious choices from available alternatives made by Defendant

Blair not to seek care or treatment for Winborn.

269.     Punitive damages are available against Defendant Blair and are hereby claimed

as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are

not subject to the pleading requirements or the differing standard of proof set forth in Minn.

Stat. § 549.20.

270.     Winborn is entitled to recovery of his costs, including reasonable attorneys'

fees, under 42 U.S.C. § 1988.

## COUNT TWO

### 42 U.S.C. § 1983

### EIGHTH AND FOURTEENTH AMENDMENT VIOLATIONS
### *Plaintiff v. Defendant Paige Pieschke*

271.     Winborn realleged and incorporates by reference herein each and every

allegation contained above as if set forth herein.

272.     Defendant Pieschke observed and was updated regarding Winborn's

progressing medical issues.

273.     Defendant Pieschke had a constitutional duty to provide for the safety and

general well-being of Winborn.

274.     Defendant Pieschke, under color of state law, acted with deliberate

indifference to Winborn's serious medical needs during his confinement at the Jail by

consciously ignoring the red flags that illustrated Winborn was an ill individual, clinically

declining and in need of medical attention and treatment.  These actions or inactions were

40

done in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

275.    Defendant Pieschke, under color of state law, knew of and consciously disregarded obvious and serious risks to Winborn's health and safety and acted with deliberate indifference in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

276.    Defendant Pieschke subjected Winborn to these deprivations of his rights either maliciously or by acting with reckless disregard for whether his rights would be violated by her actions.

277.    Winborn suffered from *Streptococcus pyogenes* and a litany of other serious medical issues, including, but not limited to, a heart attack, septic shock, gangrene and purpuric lesions and the fallout therefrom, which includes (but is not limited to) the amputation of both hands and the loss of much of his skin, as a direct and proximate result of the acts and omissions of Defendant Pieschke, and he was thereby damaged in an amount yet to be determined.

278.    Winborn suffered greatly while infection was permitted to fester in his swollen, painful right hand and thereafter, up to and including the present. Winborn exhibited obvious signs of illness and quickly deteriorated during his stay at the Jail and has suffered as a result of the conscious choices from available alternatives made by Defendant Pieschke not to seek care or treatment for Winborn.

279.    Punitive damages are available against Defendant Pieschke and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as

such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

280.     Winborn is entitled to recovery of his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT THREE

### 42 U.S.C. § 1983

### EIGHTH AND FOURTEENTH AMENDMENT VIOLATIONS
*Plaintiff v. Defendant Debra Schneider*

281.     Winborn realleges and incorporates by reference herein each and every allegation contained above as if set forth fully herein.

282.     Either upon his arrival to the Jail or shortly thereafter, Winborn exhibited multiple, obvious and progressing medical issues – the red flags.

283.     Defendant Schneider had a constitutional duty to provide for the safety and general well-being, and to treat the medical needs, of Winborn.

284.     Defendant Schneider, under color of state law, acted with deliberate indifference to Winborn's serious medical needs during his confinement at the Jail by consciously ignoring the red flags that illustrated Winborn was a very ill individual, in acute distress and clinically declining and in need of medical attention and treatment.  These actions or inactions were done in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

285.     Defendant Schneider, under color of state law, knew of and consciously disregarded obvious and serious risks to Winborn's health and safety and acted with

deliberate indifference in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

286.    Defendant Schneider subjected Winborn to these deprivations of his rights either maliciously or by acting with reckless disregard for whether his rights would be violated by her actions.

287.    Winborn suffered from *Streptococcus pyogenes* and a litany of other serious medical issues, including, but not limited to, a heart attack, septic shock, gangrene and purpuric lesions and the fallout therefrom, which includes (but is not limited to) the amputation of both hands and the loss of much of his skin, as a direct and proximate result of the acts and omissions of Defendant Schneider, and he was thereby damaged in an amount yet to be determined.

288.    Winborn suffered greatly while infection was permitted to fester in his swollen, painful right hand and thereafter, up to and including the present. Winborn exhibited obvious signs of illness and quickly deteriorated during his stay at the Jail and has suffered as a result of the conscious choices from available alternatives made by Defendant Schneider not to seek care or treatment for Winborn.

289.    Punitive damages are available against Defendant Schneider and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

290.    Winborn is entitled to recovery of his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT FOUR

### CIVIL RIGHTS VIOLATIONS
*Plaintiff v. Defendants Scott Rettke and Douglas Schnurr*

291.    Winborn realleges and incorporates by reference herein each and every allegation contained above as if set forth herein.

292.    Defendants Scott Rettke and Douglas Schnurr, as the Assistant Jail Administrator and Jail Administrator, respectively, had a duty to provide for the safety and general well-being of Winborn as an inmate at the Scott County Jail.

293.    Defendants, as supervisory employees, with callous or reckless indifference to the rights of inmates, failed to properly supervise, instruct and train correctional and medical staff in the recognition of inmates with serious medical needs.

294.    Defendants, under the color of state law, acted with deliberate indifference to Winborn's life-threatening medical needs during his confinement at the Scott County Jail in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

295.    Defendants subjected Winborn to these deprivations of his rights either maliciously or by acting with reckless disregard for whether Winborn's rights would be violated by their actions.

296.    Winborn suffered from *Streptococcus pyogenes* and a litany of other serious medical issues, including, but not limited to, a heart attack, septic shock, gangrene and purpuric lesions and the fallout therefrom, which includes (but is not limited to) the amputation of both hands and the loss of much of his skin, as a direct and proximate result of the acts and omissions of Defendants Rettke and Schnurr, and he was thereby damaged in an amount yet to be determined.

44

297.     Punitive damages are available against Defendants Rettke and Schnurr and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

298.     Winborn is entitled to recovery of his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT FIVE

### CIVIL RIGHTS VIOLATIONS
### MONELL V. DEP'T OF SOCIAL SERVICES
### *Plaintiff v. Defendant Scott County*

299.     Winborn realleges and incorporates by reference herein each and every allegation contained above as if set forth fully herein.

300.     Before August 27, 2020, Scott County, with deliberate indifference to the rights of inmates at the Scott County Jail, initiated, tolerated, permitted, failed to correct, promoted and ratified a custom, pattern, and practice on the part of Jail correctional staff, including Defendants Blair and Pieschske, of failing to provide for the safety and general well-being of inmates, failing to care for inmates suffering from obvious and serious medical needs, and failing to seek necessary medical care for inmates in order to cut costs.

301.     Before August 27, 2020, Scott County, with deliberate indifference to the rights of inmates at the Scott County Jail, initiated, tolerated, permitted, failed to correct, promoted and ratified a custom, pattern and practice on the part of Jail medical staff, including Defendant Schneider, of failing to provide for the safety and general well-being of

inmates, failing to care for inmates suffering from obvious and serious medical needs, and failing to seek necessary medical care for inmates in order to cut costs.

302.    Winborn's *Streptococcus pyogenes* was allowed to fester due to the violation of his civil rights, and his litany of other serious medical issues, including, but not limited to, a heart attack, septic shock, gangrene and purpuric lesions and the fallout therefrom was directly and proximately caused by Scott County's customs, patterns, and/or practices, and Scott County is thereby liable in an amount as yet to be determined.

303.    Winborn is entitled to recovery of his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT SIX

### FAILURE TO TRAIN UNDER
### CITY OF CANTON V. HARRIS
### *Plaintiff v. Defendant Scott County*

304.    Winborn realleges and incorporates by reference herein each and every allegation contained above as if set forth fully herein.

305.    Defendant Scott County, with deliberate indifference to inmates at the Scott County Jail, failed to properly train COs and failed to adopt, implement or require adherence to appropriate policies and the Administrative Rules regarding well-being checks and obtaining timely and appropriate care for inmates with serious medical needs.

306.    Defendant Scott County, with deliberate indifference to inmates at the Scott County Jail, failed to properly train jail medical staff and failed to adopt, implement or require adherence to appropriate policies to provide timely and appropriate care for inmates with serious medical needs.

46

307.    Defendant Scott County, by such conduct, demonstrated deliberate indifference and a protracted failure to care for the safety of Winborn, who had obvious and serious medical needs as exhibited by the multiple, early and progressing red flags throughout his time at the Jail and in front of each individually named Defendant.

308.    Winborn's *Streptococcus pyogenes* was allowed to fester due to the violation of his civil rights, and his litany of other serious medical issues, including, but not limited to, a heart attack, septic shock, gangrene and purpuric lesions and the fallout therefrom was directly and proximately caused by Scott County's customs, patterns and/or practices, and Scott County is thereby liable in an amount as yet to be determined.

309.    Winborn is entitled to recovery of his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Terrance Dwayne Winborn prays for judgment against Defendants as follows:

1.    That this Court find that the Defendant(s) committed acts and omissions constituting violations of the Eighth and Fourteenth Amendments to the United States Constitution, actionable under 42 U.S.C. § 1983;

2.    As to Count I, a money judgment against Defendant Blair for compensatory and punitive damages in an amount exceeding 20 million dollars, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

3.

4. As to Count II, a money judgment against Defendant Pieschke for compensatory and punitive damages in an amount exceeding 20 million dollars, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

5. As to Count III, a money judgment against Defendant Schneider for compensatory and punitive damages in an amount exceeding 20 million dollars, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

6. As to Count IV, a money judgment against Defendants Rettke and Schnurr for compensatory and punitive damages in an amount exceeding 20 million dollars, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

7. As to Count V, a money judgment against Defendant Scott County for compensatory damages in an amount exceeding 20 million dollars, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

8. As to Count VI, a money judgment against Defendant Scott County for compensatory damages in an amount exceeding 20 million dollars, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest; and

9. For such other and further relief as this Court may deem just and equitable.

Dated: August 1, 2023

**ROBINS KAPLAN LLP**

s/ Kathryn H. Bennett
Robert Bennett, #6713
Andrew J. Noel, #322118
Kathryn H. Bennett, #0392087
Marc E. Betinsky, #0388414
Greta A. Wiessner, #0401130
800 LaSalle Ave, Suite 2800
Minneapolis, MN 55402
Telephone: 612-349-8500
rbennett@robinskaplan.com
anoel@robinskaplan.com
kbennett@robinskaplan.com
mbetinsky@robinskaplan.com
gwiessner@robinskaplan.com

*Attorneys for Plaintiff Terrance Dwayne Winborn*